## STRAUSS v. UNITED STATES.

No. 5139.

Circuit Court of Appeals, Third Circuit.

Aug. 17, 1933.

George R. Sommer, of Newark, N. J., for appellant.

Harlan Besson, U. S. Atty., of Trenton, N. J., Samuel Cohen, of Newark, N. J., and Douglas V. Aitken, of Trenton, N. J., for the United States.

Before BUFFINGTON and DAVIS, Circuit Judges, and DICKINSON, District Judge.

BUFFINGTON, Circuit Judge.

In this case a forfeiture was decreed in favor of the United States for unlawful use of premises as a distillery. The owner appeals. The proofs showed that the officers, on entry, found two dump trucks apparently loaded with briquettes. On examination, these were found to be tank cars, one containing 2,500 gallons of alcohol, the other 2,500 gallons of molasses; and that on top of such tanks was a layer of briquettes, which gave the appearance of dump cars instead of the tank cars they really were. There were also found nineteen drums, each containing 25 gallons of alcohol, and 27 drums, each containing 50 gallons of alcohol. Back of a door which was fitted with shelves filled with tools to give the appearance of a closed wall, which door was the only entrance, was found a fermenting room in which were found nine 20,000 gallon vats, five 10,000 gallon ones, two of which latter contained 20,000 gallons of alcohol. Further proof was as follows: "Just outside of the fermenting room we found finished product tank which contained 1800 gallons of alcohol and just beyond the finished product tank we found the pump which pumped the mash into the storm sewer. Returning to the garage portion, we found a stock room in which was concealed under a sink a pump leading from the finished product tank to the stock room. By connecting a flexible hose, which was lying incidentally beside the pump, to the pump we found that it ran through the wall into the garage portion and then was attached to the truck. This was the system used in conducting the finished product from the finished product tank into the truck which then contained the alcohol. We started up the pump and alcohol flowed through the flexible hose which showed a considerable drop in the gauge on the finish-ed product tank as the pump operated. After finding the fermenting room, it took us considerable time to find the distilling apparatus because of the fact that it was cleverly concealed in a coal hopper almost forty feet from the floor level and covered with about thirty tons of coal. The pipes running the mash from the mash vats into the distilling columns was very cleverly concealed in the legs or standards supporting this coal hopper, and it was not until about 1:30, which was some six hours after our entrance into the premises, did we find the distillery. The distillery consisted of two forty-foot columns, one thirty-six foot column and one seventeen-foot column. It is a German process, rather uncommon in this country, and is known as the continuous process of distillation."

It is contended, however, that this evidence of studied violation of law should be of no avail because the officers had no probable grounds of law violation which justified them in forcibly entering the premises in daylight when they requested from those in charge of the premises permission to enter.

To us it is clear the officers had cause to believe that the building not only was a distillery, but also that it was then being operated as such. Without quoting the proofs in detail, it appears they had been advised that the health officers of New Jersey found the Passaic river was being polluted and, by a process of elimination of other plants, the New Jersey officials concluded the pollution was caused by molasses mash flowing from the plant here involved. That as a result the health authorities went to the premises and there met one Jones, who was in charge, and asserted the plant was polluting the river. Jones denied operating a still or using molasses mash and tried to put the blame on another company. That thereupon the health officials then put receptacles at the sewer lines of every industrial plant along the river and as a result found the pollution came from molasses mash from the plant here involved. Possessed of this information and of the conclusion of the health authorities, the federal officers were led to visit the premises for inspection, and when they did so, they had proof from their own senses of the correctness of the conclusions reached by the health authorities. Within a block and a half away they smelled hot alcohol and molasses, and as they passed to the rear of the premises the smell grew stronger. The smell also came up from the manhole of a sewer that led to the river.

When the manhole was opened, the mash was seen flowing and its waves or pulsations synchronized with the action of a pump which they heard working on the inside of the premises.

In view of these proofs, we think it clear that the officers, both state and federal, had reasonable grounds for believing the distillery was then being operated therein, and it was their duty to at once enter. The court was right in refusing to suppress the proofs of lawbreaking found therein. The decree of forfeiture is affirmed.